**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RODERICK GOLDEN,**

                                        **Plaintiff,**

          **vs.**                                      **5:20-CV-01566**
                                                        **(MAD/TWD)**

**SYRACUSE REGIONAL AIRPORT AUTHORITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**RODERICK GOLDEN**
208 Melrose Avenue
Syracuse, New York 13206
Plaintiff, _pro se_

**HANCOCK ESTABROOK, LLP**             **JOHN T. MCCANN, ESQ.**
100 Madison Street, Suite 1500          **EMILY MIDDLEBROOK, ESQ.**
Syracuse, New York 13202
Attorneys for Defendant

**GOLBERG SEGALLA, LLP**               **WILLIAM HENRY HYTHON, ESQ.**
5786 Widewaters Parkway
East Syracuse, New York 13057
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Roderick Golden ("Plaintiff") commenced this action _pro se_ on December 16, 2020 against Defendant Syracuse Regional Airport Authority ("Defendant" or "Airport Authority"). _See_ Dkt. No. 1. Now before the Court is Plaintiff's motion for partial summary judgment and Defendant's cross-motion for summary judgment. Dkt. Nos. 62, 68. For the reasons set forth below, Plaintiff's motion is denied and Defendant's cross-motion is granted.

## II. BACKGROUND[1]

On July 28, 2019, Plaintiff began employment as a probationary custodial worker at Hancock International Airport in Syracuse, New York. *See* Dkt. No. 68-12 at ¶¶ 1-3. Initially, Plaintiff served as an employee of the City of Syracuse. *See id.* However, effective January 1, 2020, the Airport Authority became Plaintiff's employer pursuant to an operations transition plan between Defendant and the City of Syracuse. *See id.*

Plaintiff's employment was governed by a collective bargaining agreement. *See* Dkt. No. 68-12 at ¶¶ 10-11. Pursuant to the agreement, if a certain shift assignment becomes available, employees have the opportunity to "bid" on the assignment in hopes of obtaining his or her preference. *See id.*; Dkt. No. 68-7 at ¶ 3. Bidding is open within a ten-day period. *See id.* After the period closes, shift assignments are awarded by seniority. *See id.*

In November 2019, Plaintiff complained about his unsuccessful bid for a day shift assignment, which would have included his preferred days off. *See* Dkt. No. 68-12 at ¶ 10. Plaintiff's co-worker, Josh Cruz, had greater seniority than Plaintiff and was awarded the assignment instead. *See id.* at ¶¶ 10-11. Notably, a more senior custodial worker had returned from disability leave within the ten-day bid opening, and placed a bid on the assignment that Mr. Cruz had initially preferred. *See id.* at ¶ 12. As a result, Mr. Cruz in turn bid on the shift that Plaintiff had wanted. *See id.* at ¶ 13. Plaintiff was upset over the loss of his preferred assignment to Mr. Cruz. *See id.* at ¶ 14.

---

[1] The following allegations are taken from Defendant's Statement of Material Facts and the parties' supporting exhibits and affidavits to the extent they are in admissible form. *See* Dkt. No. 68-12. Plaintiff did not submit a response admitting and/or denying the factual assertions in Defendant's Rule 56.1 Statement. *See* Dkt. No. 71. As discussed further below, insofar as Plaintiff submitted a Statement of Material Facts to support his motion for partial summary judgment, the Court has accepted as true all assertions therein to the extent they are properly supported by accurate record citations. *See* Dkt. No. 62 at 3-4.

On January 3, 2020, Plaintiff and Mr. Cruz got into a heated argument in the employee break room at the airport. *See* Dkt. No. 68-12 at ¶ 16. Defendant's Assistant Director of Terminal/Landside Operations, Pete Ryan, responded to the break room to de-escalate the altercation. *See id.* Thereafter, Plaintiff complained to Mr. Ryan that Mr. Cruz had called him the "n-word" as the latter two men were walking away from the break room. *See id.* at ¶ 17. Mr. Ryan contended that Mr. Cruz did not. *See* Dkt. No. 68-11 at 19; Dkt. No. 68-1 at ¶ 5. Nonetheless, Mr. Ryan reported the complaint to Defendant's Director of Terminal/Landside Operations, Dennis Mathers. *See* Dkt. No. 68-12 at ¶ 17.

In the following weeks, Mr. Mathers conducted initial interviews with Mr. Cruz and several witnesses who were in and around the break room and hallway at the time of the altercation. *See* Dkt. No. 68-7 at ¶ 6; Dkt. No. 68-1 at ¶ 5. After the initial interviews, Mr. Mathers turned the matter over to Defendant's Director of Human Resources, Debra Marshall. *See* Dkt. No. 68-12 at ¶ 17. Ms. Marshall conducted her own investigation into Plaintiff's allegation. *See id.* at ¶ 18. Ms. Marshall interviewed Plaintiff, Mr. Cruz, and nine other witnesses from the period of January 29 to February 7, 2020. *See* Dkt. No. 68-1 at ¶ 5. According to Ms. Marshall's findings, some of the witnesses indicated that Mr. Cruz said no such thing whereas other witnesses indicated that they did not hear him make such remark. *See id.* Aside from Plaintiff, two witnesses reported hearing Mr. Cruz use the n-word while he was in the hallway with Mr. Ryan. *See id.*; Dkt. No. 68-2 at 3. Mr. Cruz denied making any such statement. *See* Dkt. No. 68-1 at ¶ 5. Similarly, Mr. Ryan indicated that he was with Mr. Cruz at all times while walking away from the break room and denied same. *See id.*

Based on her interviews with Mr. Cruz, Plaintiff, and the nine witnesses, Ms. Marshall could not substantiate Plaintiff's allegation. *See* Dkt. No. 68-1 at ¶ 5. Notwithstanding, Ms.

3

Marshall determined that Plaintiff had instigated the altercation and that both employees had failed to treat each other respectfully. *See id.* Ultimately, Ms. Marshall recommended issuing counseling memoranda to both Mr. Cruz and Plaintiff. *See id.* Ms. Marshall coordinated her schedule with Mr. Mathers and the Airport Authority's then-Chief Operations Officer, John Carni, to conduct separate counseling sessions with Plaintiff and Mr. Cruz. *See id.* at ¶ 6; Dkt. No. 68-7 at ¶ 7. The counseling sessions were scheduled for February 18, 2020. *See id.*

On February 14, 2020, prior to the scheduled counseling sessions, Plaintiff's crew leader, Andrew Baker, reported to Mr. Mathers that Plaintiff made threatening comments about Mr. Cruz. Dkt. No. 68-12 at ¶ 21. Mr. Baker reported that Plaintiff came into his office that morning and said "he will fuck [Mr. Cruz] up if he disrespects him again" and "I'm going to break [Mr. Cruz's] back if he steps out of line." *Id.*; Dkt. No. 68-7 at ¶ 7. Based on Mr. Mathers' past experience with Mr. Baker as a crew leader, he did not doubt the veracity of the report. *See* Dkt. No. 68-7 at ¶ 7. Mr. Baker immediately prepared a written statement regarding Plaintiff's purported threat, which was then provided to Ms. Marshall and Mr. Carni. *See* Dkt. No. 68-12 at ¶ 23. At some point, Mr. Mathers spoke with Plaintiff and told him he should not make threats in the workplace. *See* Dkt. No. 68-7 at ¶ 7. According to Mr. Mathers, Plaintiff responded that he knew he was wrong but that he was not actually going to do anything. *See id.*

"Based on Plaintiff's probationary status, his instigation of the January 3, 2020 altercation and the credited threat of physical harm in violation of express policies, Defendant decided on February 18, 2020 to terminate Plaintiff's employment." Dkt. No. 68-12 at ¶ 24. Due to Plaintiff's absences, the termination decision was not communicated to him until February 21, 2020. *See id.* at ¶ 25. Following an initial denial and contested hearing, Plaintiff was awarded unemployment benefits in connection with his termination. *See id.* at ¶ 30.

4

### III. DISCUSSION

**A.      Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exists, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than

that accorded to 'formal pleadings drafted by lawyers.'" *Govan*, 289 F. Supp. 2d at 295 (quoting

*Haines v. Kerner*, 404 U.S. 519, 520 (1972) (other citations omitted). The Second Circuit has

directed that the court is obligated to "'make reasonable allowances to protect *pro se* litigants'"

from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting

*Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not

excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Id.*

(citation omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by

evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F.

Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B.     Local Rules 7.1 and 56.1**

In the Northern District of New York, Local Rule 7.1(b) states that "all motions and

opposition to motions require a memorandum of law, supporting affidavit when necessary to

establish and provide factual and procedural background relevant to the motion, and proof of

service on all the parties." N.D.N.Y. L.R. 7.1(b). Regarding summary judgment motions, Local

Rule 56.1(b) requires the party opposing summary judgment to "file a separate Response to the

Statement of Material Facts." N.D.N.Y. L.R. 56.1(b). The response must "mirror the movant's

Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short

and concise statement, in matching numbered paragraphs." *Id.*

Importantly, "[t]he Court may deem admitted any properly supported facts set forth in the

Statement of Material Facts that the opposing party does not specifically controvert." L.R.

56.1(b); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has

broad discretion to determine whether to overlook a party's failure to comply with local court

rules[.]  Thus . . . while a court 'is not required to consider what the parties fail to point out'. . . , it

may in its discretion opt to 'conduct an assiduous review of the record'") (quotation and citations

omitted).  "The fact that there has been no response to a summary judgment motion does not, of

course, mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483,

486 (2d Cir. 1996).  Rather, "[s]uch motion may properly be granted only if the facts as to which

there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of

law.'"  *Id.* (quoting Fed. R. Civ. P. 56(c)).

In the matter at-hand, Plaintiff submitted a Statement of Material Facts with his motion

that, with several exceptions, contains individually-numbered paragraphs with citations to record

evidence.  *See* Dkt. No. 62 at 3-4.  However, Plaintiff submitted neither a memorandum of law

nor a supporting affidavit with his motion.[2]  *See* Dkt. No. 62.  Defendant submitted a Statement of

Material Facts to support the cross-motion, as well as providing a mirrored response to Plaintiff's

factual allegations.  *See* Dkt. Nos. 68-12 & 68-13.  Although Plaintiff submitted a response to the

cross-motion, he did not specifically address Defendant's arguments; nor did he provide an

individually-numbered response admitting and/or denying Defendant's factual assertions.  *See*

Dkt. No. 71.  While the Court is mindful of Plaintiff's *pro se* status, that does not excuse him from

complying with the Local Rules.  *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 427 & n.4

(N.D.N.Y. 2009) (collecting cases) ("As has often been recognized by both the Supreme Court

and Second Circuit, even *pro se* litigants must obey a district court's procedural rules").

Accordingly, the Court will deem admitted all properly supported factual assertions set forth in

Defendant's Statement of Material Facts.

**C.      Title VII Discrimination**

---

[2]  Notably, Defendant provided Plaintiff with a copy of the Notice of Consequences of
Failing to Respond to a Summary Judgment Motion, as required by Local Rule 56.2.  *See* Dkt.
No. 70.

"Title VII provides that it is 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or natural origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e–3(a)).  Discrimination claims under Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* framework, the plaintiff must first make a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).

"Once an employee makes a *prima facie* case of [discrimination], the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014).  If the employer is able to provide such a reason, "the burden shifts back to the plaintiff to show that the employer's explanation is pretext for race discrimination." *See id.*  To rebut the articulated justification for the adverse action, "the plaintiff must show 'both that the reason was false, and that discrimination was the real reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4 (1993) (internal quotations omitted).  "'[T]he [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination.'" *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quotation and citation omitted).  This burden-shifting analysis informs the ultimate determination of whether the evidence reasonably supports an inference of the facts plaintiff must prove.  *See*

*James v. New York Racing Ass'n*, 233 F.3d 149, 1457 (2d Cir. 2000).

Defendant states that "[i]t appears that Plaintiff is pursuing claims of racial harassment and retaliation, and does not make a disparate treatment discrimination claim," but that "should the Court determine that Plaintiff is pursuing such a claim, Plaintiff fails to establish a *prima facie* case[.]"  Dkt. No. 68-14 at 18.  Defendant argues that Plaintiff has failed to establish even a *prima facie* showing of race-based employment discrimination because "he presents nothing to support a claim that employees of different races were treated differently under similar circumstances or otherwise provide support for an inference of discrimination[.]"  *Id.* at 18-19.

In any event, Defendant asserts that "Plaintiff's probationary employment was terminated following his threat of physical harm to a coworker, in violation of a Workplace Violence Prevention Policy."  Dkt. No. 68-14 at 19.  Moreover, insofar as Plaintiff claims his shift assignment was discriminatory, Defendant asserts that Mr. Cruz "was awarded that particular shift and days off" based on seniority and that another worker had "returned to work from disability leave within the ten day bidding period, and successfully bid on the shift previously selected by [Mr.] Cruz based on his greater seniority."  *Id*.  Defendant asserts that "[t]he result of this was Josh Cruz putting in a bid on the shift with days off previously selected by Plaintiff[.]" *Id*.  Defendant contends that Plaintiff "cannot rebut Defendant's legitimate business reasons for the job bid result or his discharge."  *Id*.  As to Plaintiff's discharge, Defendant asserts that, "[e]ven assuming *arguendo*, the Airport Authority had wrongly concluded that Plaintiff threatened a co-worker . . .  '[t]he truth of the allegations against' a plaintiff accused of misconduct is irrelevant." *Id.* at 20 (citation omitted).

In response to Defendant's cross-motion, Plaintiff states that "[t]his case is about a violation of policy and a so-called threat made."  Dkt. No. 71 at 2.  Defendant states that "[s]o the

question for the court from this point is was [Plaintiff] in violation of a policy.  The answer is no because no policy existence [sic] at the time of my complaint or my termination as admitted by Debbie Marshall herself." *Id.*  Additionally, Plaintiff states that "[t]he next question is was a threat made in front of Josh Cruz or to him answer no." *Id.*  Plaintiff contends that the Administrative Law Judge ["ALJ"] who presided over his unemployment hearing determined that "the threat was not made to coworker [sic] or in his presence" and that it has not "been proven that [Plaintiff] made a threat to any employee or anyone while working for [Defendant]." *Id.* Plaintiff argues that this Court should not consider Defendant's evidence on the issue because of the ALJ's prior ruling. *Id.*  Moreover, Plaintiff contends that Defendant's investigation into his complaint about Mr. Cruz "could not have been a truthful proper investigation without a policy in place neither can they support the fact of a threat being made without proper due process and a policy in place." *Id.*  Finally, Plaintiff asserts that he "was fired for the self-satisfaction of Debbie Marshall not because of anything of [his] doing." *Id.*

Herein, taking into consideration Plaintiff's *pro se* status, and inferring from Plaintiff's complaint that he has asserted a Title VII disparate treatment claim, the Court finds that there is no record evidence supporting as much.  The Court further notes that, insofar as Plaintiff relies on the ALJ's previous factual findings and determinations, such rulings have no preclusive or binding effect upon the instant proceedings.  *See Obiajulu v. City of Rochester*, 975 F. Supp. 469, 471-72 (W.D.N.Y. 1997); N.Y. Lab. L. § 623.  Notwithstanding, and contrary to Plaintiff's contentions, the ALJ's findings would severely undermine the claims in this case.[3]

---

[3]  For instance, Plaintiff asserts in his Statement of Material Facts that the ALJ concluded he "was not liable for violation [sic] of a policy neither was [Plaintiff] found liable for any threats toward anyone, and [Plaintiff's] actions did not rise to disqualifying misconduct."  Dkt. No. 62 at 4.  Based on the record before the Court, this assertion is incorrect; rather, the ALJ found, *inter alia*, that Plaintiff in fact made a threat against Mr. Cruz on February 14, 2020, but noted that it

Even assuming Plaintiff did not make a threat of violence relative to Mr. Cruz, there is simply no evidence showing that Defendant's decisions to change Plaintiff's shift and, ultimately, to terminate his employment, were motivated by race.  Rather, the record evidence shows that Defendant had legitimate concerns about Plaintiff's behavior during the brief period in which he was employed.[4]  *See* Dkt. No. 68-1 at ¶¶ 4-5; Dkt. No. 68-2; Dkt. No. 68-7 at ¶ 6.

To the extent Plaintiff is attempting show disparate treatment vis-a-vis Mr. Cruz, such attempts are undercut by the fact that Defendant decided to counsel both employees for disrespectful behaviors on January 3, 2020.  *See* Dkt. No. 68-1 at ¶¶ 5-6; Dkt. No. 68-7 at ¶ 7.  Furthermore, based on the record before the Court, there is no evidence showing that Mr. Cruz was on a similar probationary period, or that he had prior documented instances of disrespectful and threatening behaviors that would warrant termination.  Likewise, Plaintiff presents no other similarly situated employees to establish even a *prima facie* disparate treatment claim.  *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).

Accordingly, any Title VII race discrimination claim based on a disparate treatment theory must be dismissed.

**D.    Title VII Hostile Work Environment**

To prove a hostile work environment claim, "a plaintiff must establish that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

---

was not made in Mr. Cruz's presence.  *See* Dkt. No. 32 at 38.

[4]  The record indicates that Defendant had additional concerns about Plaintiff's behavior in light of his extensive criminal history, which includes "four convictions for assault and one for menacing, among other offenses." Dkt. No. 68-1 at ¶ 9.  Defendant knew of this history prior to hiring Plaintiff but "decided give [him] a chance[.]" *Id.*  Defendant indicates that the nature Plaintiff's criminal history factored into the decision to terminate his probationary employment. *See id.*

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Legg v. Ulster County*, 979 F.3d 101, 114 (2d Cir. 2020) (quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)).  "This showing has both objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also 'subjectively perceive that environment to be abusive.'" *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)).  "Furthermore, the plaintiff 'must demonstrate that the conduct occurred because of' his protected status . . . and also that a 'specific basis exists for imputing the conduct that created the hostile work environment to the employer.'" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (quotation omitted).

"'The objective hostility of a work environment depends on the totality of the circumstances,' viewed from 'the perspective . . . of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target.'" *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (quotation and other citation omitted).  Accordingly, courts must take care "not to view individual incidents in isolation" or "'view the record in piecemeal fashion.'" *Id.* (quotation omitted).  Factors considered as part of the totality of the circumstances include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance.'" *Legg*, 979 F.3d at 114-15 (citation omitted).

To be deemed "pervasive," discriminatory incidents "must be more than 'episodic;' they must be sufficiently continuos and concerted." *Agosto*, 982 F.3d at 102 (quotation and other citation omitted).  A single incident may suffice to create a hostile work environment, "but to do

so it must be 'extraordinarily severe.'" *Id.* (quotation omitted).  "'[A] plaintiff need not show that

her hostile working environment was both severe *and* pervasive; only that it was sufficiently

severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her

working conditions.'" *Rodriguez v. County of Nassau*, 830 Fed. Appx. 335, 339 (2d Cir. 2020)

(quoting *Redd*, 678 F.3d at 175).  Title VII, however, "'does not set forth a general civility code

for the American workplace,'" *Redd*, 678 F.3d at 176 (quotation omitted), and does not "prohibit

employers from maintaining nasty, unpleasant workplaces," *Krasner v. HSH Nordbank AG*, 680

F. Supp. 2d 502, 513 (S.D.N.Y. 2010).

    "The question of whether a work environment is sufficiently hostile to violate Title VII is

one of fact," and "[s]ummary judgment is appropriate only if it can 'be concluded as a matter of

law that no rational juror could view [the defendant's conduct] as . . . an intolerable alteration of

[the plaintiff's] working conditions.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001)

(quotation and other citation omitted).  "While this determination may involve difficult line-

drawing that is sometimes best left for a jury, . . . summary judgment is appropriate 'when

reasonable minds could not differ on the issue' of whether a work environment is hostile."  *O'Dell

v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378, 386 n.3 (S.D.N.Y. 2001) (quotation and other

citation omitted), *aff'd*, 40 Fed. Appx. 628 (2d Cir. 2002).

    Defendant asserts that "even upon viewing the circumstances in their totality, there is

insufficient evidence of severe or pervasive racial harassment such as would alter the conditions

of Plaintiff's employment and create an abusive environment[.]"  Dkt. No. 68-14 at 23.  Defendant

contends that "the utterance of a racial slur on one occasion fails to state a racial harassment claim

under Title VII."  *Id.*  Defendant argues that "[t]here is no evidence that Plaintiff was subjected to

a steady barrage of racial comments" and that "District courts within this Circuit have had little

difficulty granting summary judgment" in similar cases. *Id.* (citations omitted).  Moreover, Defendant argues that liability cannot be "imputed" in this case because "[t]here is no evidence that the Airport Authority failed to act upon Plaintiff's complaint of racial harassment." *Id.* at 25. Defendant states that Plaintiff does not allege Defendant "failed to provide an avenue for employees to complain" and that "when Plaintiff did report a complaint related to Mr. Cruz, the Airport Authority conducted a fair objective and thorough investigation in response to his concerns." *Id.*

To support his motion for partial summary judgment, Plaintiff has submitted nearly 300 pages of documentary exhibits, which include documents concerning his initial hiring (Dkt. No. 62 at 6-8), his unemployment proceedings (Dkt. No. 62 at 41-275), Ms. Marshall's investigation findings (Dkt. No. 62 at 9-32), and various issues that allegedly arose during Plaintiff's employment (Dkt. No. 62 at 33-40).  As mentioned previously, Plaintiff submitted a Statement of Material Facts, but he did not submit an accompanying affidavit or memorandum of law. *See* Dkt. No. 62.  As to Defendant's cross-motion, Plaintiff provides little if any substantive response regarding the arguments raised.  *See* Dkt. No. 71.  Instead, Plaintiff asserts his general position that "[t]his case is about a violation of a policy and a so-called threat made," and that the ALJ already made a determination in his favor. *See id.* at 2.

Herein, while the Court remains mindful of his *pro se* status, Plaintiff has made little effort to advance a coherent Title VII hostile work environment theory.  If anything, the undisputed record evidence shows that, upon learning about Plaintiff's allegation of racial harassment, Defendant took the matter seriously, prompting an immediate and thorough investigation, which included multiple interviews with nearly a dozen individuals.  *See* Dkt. No. 68-12 at ¶¶ 17-19; Dkt. No. 68-1 at ¶ 5; Dkt. No. 68-2; Dkt. No. 68-7 at ¶¶ 6-7.  There is simply

14

no evidence that Defendant fostered severe or pervasive racial harassment altering the conditions of Plaintiff's employment.

Accordingly, Plaintiff's Title VII hostile work environment claim must be dismissed.

**E.      Title VII Retaliation**

Title VII prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a). Courts analyze Title VII retaliation claims according to the burden-shifting framework set forth in *McDonnell Douglas*. *See Terry*, 336 F.3d at 141 (citation omitted). To make out a *prima facie* case of retaliation under Title VII, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find:

> "(1) that [the employee] engaged in protected participation under Title VII . . . , (2) that the employer was aware of this activity, (3) that the employer took adverse action against the [employee], and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."

*Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (quotation and other citations omitted). "Upon such a showing, the defendant must articulate legitimate non-discriminatory reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." *Holt v. KMI-Cont'l*, 95 F.3d 123, 130 (2d Cir. 1996). Notably, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013).

Defendant argues that "it is not enough for Plaintiff simply to have complained. Rather,

the complaint must be supported by a good faith and reasonable belief that the Airport Authority violated the law." Dkt. No. 68-14 at 26. Defendant argues that Plaintiff's complaint was "likely undertaken in a tranparent [sic] effort to regain the working shift with days off that Plaintiff preferred" and thus not a "good faith" complaint. *Id.* at 28. Notwithstanding, Defendant states that "Plaintiff overlooks the fact that there is a difference between an isolated racial slur, which is always and everywhere inappropriate, versus the 'steady barrage of opprobrious racial comments' that are considered severance [sic] and pervasive so as to state a Title VII claim." *Id.* at 29 (citations omitted). Finally, Defendant asserts that "Plaintiff relies solely on the circumstantial timing of this decision as evidence of a causal connection between his internal complaint and his discharge[,]" but that the "timing of the discipline is undercut by Plaintiff's intervening misconduct" in violation of Defendant's Workplace Violence Prevention Policy. *Id.*

In his response, Plaintiff fails to specifically address Defendant's arguments concerning the alleged retaliation. *See* Dkt. No. 71. Plaintiff simply reasserts that there was no "policy" in existence at the time of his termination; that the alleged threat was not made in Mr. Cruz's presence; that the ALJ ruled in his favor; and that he "was fired for the self-satisfaction of Debbie Marshall not because of anything of [Plaintiff's] doing." *Id.*

Here, the undisputed record demonstrates that no rational finder of fact would infer that Plaintiff would not have been terminated but-for his alleged protected activities. Defendant has articulated a legitimate non-retaliatory reason for Plaintiff's termination, *i.e.*, while on probationary status, and following a previous investigation finding that he and Mr. Cruz behaved disrespectfully, Defendant received a credible report that Plaintiff made threats of physical violence against Mr. Cruz. *See* Dkt. No. 68-1 at ¶¶ 3-10. And while Plaintiff provides no direct evidence of retaliation, assuming that he was relying on temporal proximity, this alone is

insufficient to defeat summary judgment at the pretext stage.  *See Vitti v. Macy's Inc.*, 758 Fed.

Appx. 153, 158 (2d Cir. 2018) (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir.

2010)).  Based on the record before the Court, there is no other circumstantial evidence beyond

the timing of his termination that could create an issue of fact with respect to pretext.

Accordingly, Plaintiff's Title VII retaliation claim must be dismissed.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter and the applicable law, and for

the above-stated reasons the Court hereby

**ORDERS** that Plaintiff's motion for partial summary judgment (Dkt. No. 62) is **DENIED**;

and the Court further

**ORDERS** that Defendant's cross-motion for summary judgment (Dkt. No. 68) is

**GRANTED**; and the Court further

**ORDERS** that the complaint (Dkt. No. 1) is **DISMISSED** with prejudice; and the Court

further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close

this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order upon all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  July 31, 2023
         Albany, New York

Mae A. D'Agostino
U.S. District Judge

17